| 3 | 417 |
| 47 | 1057 |
| 3 | 417 |
| 52 | 1436 |
| 3 | 417 |
| 110 | 662 |

## THE AUGUSTA INSURANCE AND BANKING COMPANY *v.* MORTON et ux.

No judgment can be rendered against an absentee, where no property of his has been attached, and he has not personally appeared. The appointment of a curator *ad hoc* cannot give jurisdiction.

Art. 2412 of the Civil Code, which provides that the wife cannot bind herself for the debts of her husband, according to the doctrine of the civilians, is a *personal* statute. It is founded exclusively on the personal relations between husband and wife, and is confined in its operation to married persons within our jurisdiction. The disability to contract, which it establishes, exists only in a certain contingency, that of the debts not inuring to her benef't, and that contingency is strictly personal.

The incapacity of a married woman to contract is of the same character as that of a minor, and the laws creating the incapacity of the latter have always been classed among *personal* statutes.

Those statutes are *real*, in contradistinction to *personal*, which regulate directly property, without reference to the condition or the capacity of its possessors.

Where a married woman domiciliated in another State, to secure a debt of her husband, mortgages, by an act executed at her domicil, real estate in this State forming part of her separate property, the act, if valid in point of form, and authorized by the laws of her domicil, will be enforced here. *Per Curiam*: Such an act conflicts with no law of this State, and no reason of comity would authorize a court here to relieve the wife from its effect. It interferes with no *real* statute, and the *personal* statute does not reach it; the person not being subject to our jurisdiction.

The disability resulting from the conditions of persons is personal; and contracts valid at the place of the domicil are valid without reference to the situation of the property, so far as the capacity of the party to contract is concerned.

AUGUSTA INSU-
RANCE AND
BANKING COM-
PANY
*v.*
MORTON.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. The facts of this case are stated in the opinion of the court *infrâ*.

*Micou*, for the plaintiffs, relied on the cases of *Richardson* v. *Leavitt*, 1 An. 430. *U. S. Bank* v. *Merchants' Bank*, 2 Ibid. 659. *McDowell* v. *Read*, *ante*, 391.

*W. D. Hennen*, for the appellants. I. No property whatsoever of *G. C. Morton* was seized. The process of the court has never reached his person or his property, and he comes before it simply by the appointment of a curator *ad hoc*. No judgment therefore should have been rendered against him. *Dupuy* v. *Hunt*, 2 An. R. 562.

II. By the plaintiffs' own allegations, *Mrs. Morton* did not bind herself, but only her property, and no judgment should have been rendered against her personally. The articles of the Code are express. C. C. arts. 3263, 3264. *New Orleans Canal and Banking Company* v. *Hagan*, 1 An. R. 65.

III. Every State has exclusive jurisdiction within its own territory, and its laws govern all persons and things within that jurisdiction; all persons, whether citizens or aliens; all things, whether real or personal, moveable or immovable. C. C. art. 9. It is a necessary result of the independence inherent in every sovereignity, that the laws of a State can have no force beyond its own territories, *e proprio vigore*. Whatever obligation then the laws of one country have in another, must depend upon the consent of the latter. Its policy may forbid the introduction of all foreign laws, or its indulgence may admit their operation so far as they do not interfere with its domestic interest. It is not presumed that these principles will be controverted; and we advert to them only because, unless some exception to their operation in the present instance be shown, they must determine the rights of the parties in this suit.

The first general exception admitted by the principle of comity, to the supremacy of the laws of a State over all property within its territory, arises from the distinction between things personal and real, moveable and immovable. To support this exception the law creates a fictino, that things moveable have no *situs*, and that thus, not being within the territory, their exemption from the law offers no violence to its sovereignty. *Succession of Packwood*, 9 Rob. 443. Yet even this rule is by no means of universal application. An assignment under bankrupt laws is not considered, generally, in this country, as of universal operation to transfer moveable property in whatever country it may be locally sitnated: though a different doctrine is established in England and in many of our sister States. 2 Kent, 404, 408. With us a voluntary assignment for the benefit of cred.tors, with certain preferences, will not operate upon property situated here, whether immovable or moveable. *Andrews* v. *His Creditors*, 11 La. R. 376. And if a contract be made abroad relative to a chattel in this State, that contract will not be permitted to be executed here to the injury of our own citizens. *Thurot* v. *Jenkins*, 7 M. 355. *l'rice* v. *Morgan*, 7 M. 707. But whatever may be the rule with regard to personal property, the principle of the law's sovereignty within its own territory, suffers no exception with regard to immovable property. "All the authorities, both in England and America, so far as they go, recognize the principle in its fullest extent, that real estate or immovable property is exclusively subject to the laws of the government within whose territory it is situated, Story, Conflict of Laws, § 428. Pothier has laid down the rule in the most general manner, declaring that, such laws have an exclusive dominion over all things submitted to their authority, whether the person owning them live within the territory or without the territory. Pothier, Cout. d'Orleans, chs. 1 and 2, nos. 22, 23, 24; ch. 3, no. 51. And Vattel has laid it down, as a principle of international law, that immovables are to be disposed of according to the laws of the country where they are situated·" Vattel, b. 2, ch. 8, § 110. Story, Ibid, § 727. And in the case of *Kerr* v. *Moon*, 9 Wheaton, 570, the Supreme Court of the United States said: "It is an unquestionable principle of general law, that the title to and the disposition of real property, must be exclusively subject to the laws of the country where it is situated." By referring to the authorities cited by Judge Story in § 428, this rule will be found established as firmly as a rule can be, by judicial decision, in the common law. And even among foreign writers, with some exceptions, the general principle is admitted, as laid down by Huberus: *Communis et recta sententia est, in rebue immobilibus servandum est jus loci, in quo bona sunt sita.*

As a necessary result of this doctrine, it follows that the title to real property, can be acquired, passed. and lost, only according to the *lex rei sitæ.* "Here the general principle of the common law is, that the laws of the place where

the property is situated, exclusively govern in respect to the rights of parties, the modes of transfer, and the solemnities which should accompany them." Story, Ibid. § 404.  And in the case of *Curtis* v. *Hutton*. 14 Vesey, Jr., 537, Sir W. Grant said : " The validity of every disposition of real estate must depend upon the law of the country in which that estate is situated."  Thus, by the law of England, alienations and devises of real estate in mortmain, or for charitable purposes, are prohibited. If, therefore, an american citizen, owning lands in England, should alienate or devise such lands, in violation of the mortmain acts, the instrument, whether *inter vivos* or testamentary, would be held void.  And the same principle would apply to a trust, created in personal property, to be invested in lands in England, for the like purposes.  Story, Ibid. § 447.  And, in such cases, the invalidity of the disposition of the real estate results, not from any incapacity attached to the person conveying or devising, but from the purpose. object, or consideration for which the alienation is made, and which being reprobated by the law of the *situs*, cannot take effect.

'   Such is the fixed rule of the common law : it is recommended by its simplicity and uniformity, and relieves us of the perplexities with which this subject has been entangled by those writers who, as was remarked by the court in the case of *Saul* v. *His Creditors*, 17 M. 594, " have attempted to define and fix that, which cannot, in the nature of things, be defined or fixed."

We are not aware that the rule has ever been denied in the decisions of our own courts.  There are, however, two cases which look towards a different doctrine.  *Thatcher* v. *Walden*, 5 Mart. N. S. 466, and *Hall* v. *Mulhollan*, 7 La. 388   In the former, the court decided that a verbal power of attorney, given in the State of Alabama. where slaves pass by parol, is legal proof of the authority under which a written sale was made in this State.  It does not appear from the report whether the slave sold was in this State, or in the State of Alabama, at the time the mandate was given, which would make a difference. The court, however, considered the question as one of evidence, and that the contract of mandate had been made in Alabama, and was binding there on the principal, wherever the agent might carry it into execution.  It was said that no valid distinction could be made between the right to sell, as derived from a verbal power, and that acquired by a purchase made by parol ; and that it had never been doubted that in the latter case such evidence was good, where the slave was bought in a country where writing was not necessary to give validity to the contract.  It appears to us that a very material distinction could be made between the right to sell a slave in this State, as derived from a verbal power given in Alabama, and the right acquired by a purchase made by parol, when such purchase had first vested the title in the purchaser, and he had brought the slave afterwards into this State.  It is certain that if the slave was in this State when the power by parol was given, such a decision would not have been rendered by the Supreme Court of the United States.  For in the case of *Clark et al.* v. *Goaham*, 6 Wheaton, 577, they decided the very point, that " a power to convey lands must possess the same requisites, and observe the same solemnities, as are necessary in a deed directly conveying the lands."  In this case the power was given in Virginia, and the deed of sale conveying the land was made in Ohio, where the land was situated.

In the other case, of *Hall* v. *Mulhollan*, it was decided that a bill of sale, executed in Kentucky, and valid under the laws of that State, which expresses the sale to be made for a valuable consideration, without fixing any price, of certain slaves in Louisiana, will be tested by the laws of the place where the contract was entered into, and, being valid there, is good here, as between the parties, although not made in conformity to the laws of the State.  But here again the court considered the question as one of evidence merely, and relating to the form of the instrument, which contained an agreement otherwise valid. The court says that, the question presented is, whether " the instrument is evidence of a contract of sale ;" and, being satisfied that by the laws of Kentucky it would be, gave judgment accordingly.  Perhaps, considering the question as one relating merely to the form of the instrument, this decision, under the 10th art. of the Civil Code, was correct.  But the court was content to render its decree, without reference to that or any other article of the Code ; nor did it consider the question either on principle or authority, so that we may fairly apply to it the criticism of Kent on the case of *Harrison* v. *Sterry* : " that it is not to be presumed that any court intends either to establish or reject a litigated point of law, of great importance, merely by a dry decision, unaccompanied with argument or illustration."

Augusta Insurance and Banking Company
v.
Morton.

AUGUSTA INSU-RANCE AND BANKING COMPANY v. MORTON.

It may not be improper here to observe, that the principles, on which questions arising out of the conflict of laws have been determined in the courts acting under the civil or the common law, appear to be wholly independent of either, as a system. It is true, that the conflict may arise out of the difference between the principles of the common and the civil law; as has happened repeatedly in this State, in questions of sale. 4 Mart. 20. 5 Mart. 23. 7 Mart. 24. 2 Mart. N. S. 93. But it is clear that, the principles by which this conflict is to be determined, are quite distinct from the principles which create the conflicting rights themselves. Frequent allusion to the diversity of laws between different States, is, it is true, to be found in the Pandects, and the roman lawyers " have established principles which have served as landmarks to direct the operations of their successors." Livermore's Dissertation, § 2, 8. But they have decided but few cases, and there is nothing, either in the subject itself or in the foreign authorities who have treated of it, that is more suited to the genius of the civil than the common law. And, therefore, though the former be the basis of our own jurisprudence, still, on this subject, we see no reason why the court should look less favorably upon the rule established by the english and american courts, simple and consistent as it is, than upon the speculations and theories of writers, who have established systems always at war with each other, and not unfrequently with themselves.

We have spoken chiefly of the alienation of immovable property ; but it is evident that the same remarks are equally applicable to the creation of a right of mortgage on such property, even if the granting of a mortgage be not itself considered as a species of alienation. " It has been seen," says Burge in speaking on this subject, "that the creation and modification, as well as the nature and extent of the estates and interest acquired in immovable property, and generally the form and manner of its transfer, are governed by the law of the country in which that property is situated. The language in which jurists have expressed, and the principles on which they found this opinion, are sufficiently comprehensive to warrant the conclusion that the constitution or acquisition of the *jus hypothecæ* in immovable property, and the rights and obligations of the mortgagor and mortgagee, are also wholly dependent on the *lex loci rei sitæ.* It must be determined by that law whether the property may be the subject of, and whether the one party is competent to grant and the other to receive, the hypothec. A conformity with that law, both in the instrument of hypothecation, its probate and registration, is no less essential in creating the *nexus* on the property, than in transferring the *dominium* of it. There is no consideration by which the supremacy of the *lex loci rei sitæ* in deciding on the validity of the trasfer of the *dominium* is maintained, which does not equally maintain it in deciding on the validity of the hypothec. Whether the hypothec be conventional or express, tacit or judicial, and whether it be general or special, it can affect immovable property so far only as it is sanctioned by the law of the place in which the property is situated." Burge's Commentaries on Foreign and Colonial Laws, vol. 3, p. 388, part ii, ch. xii, sec. vi, and authorities there cited. The real contract upon which this suit is based, if tested by these principles, can give no right of action. For a married woman in this State cannot bind herself, or her property, for her husband's debts. C. C. arts. 1784, 2412. But it may be said that the validity of a contract is to be decided by the law of the place where it was made ; if valid there, it is by the general law of nations held valid every where ; and this is expressly sanctioned by our law. Code of Practice, art. 13. If, then, the contract of mortgage, entered into by *Mrs. Morton* in Maryland, is valid by the laws of that State, it is valid everywhere, and ought to be upheld here. This is true, subject to certain exceptions. The rule is accurately laid down by Kent, vol. 2, p. 457. He says : " It is the settled doctrine of public law, that personal contracts are to have the same validity, interpretation, and obligatory force in every other country, which they have in the country where they were made." But this is not true of real contracts. It is true only of those contracts which create a personal obligation. When the contract is personal it accompanies the person of the obligor wherever he goes, and the obligation which the contract acquired by the *lex loci contractus,* may well go with it. But a contract which creates a real obligation, must be confined within the jurisdiction of the thing to which the obligation relates. For, if the contract rest in a thing and not a person, and the thing, like immovable property, be fixed within a particular jurisdiction, the obligation of the contract must remain within the same jurisdiction. The courts of com-

mon law in England entertain no action *in rem* for immovable property situated AUGUSTA INSU-
in another country.   And such also is the doctrine of the american courts.   RANCE AND
Burge's Commentaries, vol, 3, p. 397, part 2, chap. 12, sec. 5.   BANKING COM-
  Out of the questions arising under this rule, where a contract, valid in the   PAOY.
place of its execution, is invalid in the place of its subject matter, has sprung all   MORTON.
the machinery of real and personal statues.   And it is upon the distinction be-
tween these two classes of statutes that the application of the *lex loci* on the
one hand, and the *lex rei sitæ* on the other, has been made to depend by the
foreign jurists.   According to these writers, a personal statute is that which
follows and governs the party subject to it wherever he goes; while the real
statute controls things, and does not extend beyond the limits of the country
from which it derives its authority.   Both Kent (vol. 2, p. 456,) and Story
(Conf. of Laws, § 13,) consider Merlin as having arrived at the most definite
and intelligible result, in determining the real and personal nature of statutes;
he has followed the rules of Chancellor D'Aguesseau,which were considered as
preferable to any others by the court, in *Saul* v. *His Creditors*, 17 Mart. 593.
We will therefore refer to Merlin.

He says: " Pour juger si un statut est réel ou personnel, il ne faut pas en
considérer les effets éloignés, les conséquences ultérieures : autrement, comme
il n'y a pas de statut personnel qui ne produise un effet quelconque par rapport
aux biens, ni de statut réel qui n'agisse par contre-coup sur les personnes, il
faudrait dire qu'il n'y a point de statut qui ne soit tout.à la fois et personnel et
réel; ce qui serait absurde, et tendrait à établir une guerre ouverte entre les
coutumes.   Que faut-il donc faire ?   Il faut s'attacher à l'objet principal,
direct, immédiat de la loi, et oublier les effets.   Si l'objet principal, direct, im-
médiat de la loi, est de regler l'état de la personne, le statut est personnel; les
effets, par rapport aux biens, ne sont plus que les conséquences éloignées de la
personnalité.   Au contraire, si l'objet principal, direct, immédiat de la loi, est
de régler la qualité, la nature des biens, la manière d'en disposer, le statut est
réel; les effets, par rapport aux personnes, ne sont plus que des conséquences
éloignées de la réalité."   Rep. de Jur. Autor. Marit, § 10.

Personal statutes, then, are those which have principally for their object the
person, and treat only of property incidentally.   Real statutes are those which
have principally for their object property, and which do not speak of persons,
except in relation to property ; as are those which concern the disposition one
may make of his property, either while he is living or by testament.

Of what nature, then, in this view of the subject, is the law of Maryland,
by which a wife, though generally incapacitated to enter into any contract, is
enabled to bind her property for her husband's debts?   Let us apply to it the
test of Merlin.   Keeping out of view all its remote and consequential effects,
what is its principal, direct, and immediate object?   Clearly, the subjection of
the wife's equitable estate, to the payment of the husband's debts.   This is
the aim and intent of the statute.   To accomplish its object, it is necessarily
compelled to clothe the wife with a capacity she did not before possess; but it
does not aim at the regulation of her 'état,' her 'status,' her 'general condi-
tion.'   The statute finds a large species of property within its jurisdiction, so
tied up that it is unavailable for commercial purposes : the statute unties it, ex-
empts it from the disability impressed upon it, and, having found it " *extra com-
mercium*," leaves it " *in commercio*."   Our policy is directly the reverse—to
preserve the wife's estate in the family ; the policy of this statute is, to render
that property available for the husband's use, and thus to draw it into the cur-
rent of trade.   The effect upon the wife's capacity is a necessary means for
the attainment of this policy.   The act permitted, is a real act.   But the per-
mission of a real act does not affect the personal capacity.   Livermore's Dis-
sertation, § 194.   The permission of a personal act has indeed that effect.
When the law says that a married woman shall be under the power of her hus-
band, and shall not have the power of contracting, it establishes the general
state of that person.   When the law further declares that, a person of that
State shall be incapable of binding herself for her husband, it prohibits the
performance of a personal act, and the law is personal.   But when the law fur-
ther declares that the wife, who is incapable of binding herself for her husband,
may bind her property for him, the permission falls directly upon a real act.
The immediate and direct effect is then upon the property, rendering it aliena-
ble by persons who are not *sui juris*.   Livermore, Ibid. § 191.

  Boullenois, in discussing an analogous statute, determines it to be real.   He

supposes that the statute of the domicil, by which a person is a minor and pro-
hibited generally from alienating, gives him capacity to alienate for a particular
purpose, and he then asks what statute is to govern when the law of the *situs*
does not permit an alienation for any such purpose. " Dans la seconde espece;
c'est-à-dire dans le cas où la loi du domicile permet au mineur quelque acte
d'aliénation, comme, par exemple, si la loi permet à un mineur de donner ses
propres à son conjoint par don mutuel, mais que la loi de la situation le lui
défende comme mineur, j'estime dans cette espece, que le statut du domicile
habilite effectivement le mineur pour cet acte qu'elle lui permet ; mais que ne
mettant dans ce mineur q'une capacité particuliere, à son état personnel étant
un état d'incapacité, l'homme porte par-tout son incapacité d'état, et ne peut
porter ailleurs cette capacité particuliere de son domicile, au préjudice du sta-
tut de la situation, cette capacité particuliere étant personnelle réele. Ibid.
vol. 1, p. 100, Obs. 5, ch. 2, tit. 1. And Merlin has laid down the same prin-
ciple still more broadly. He says: " La loi qui, en laissant une personne dans
son état, lui défend un acte particulier que son état lui permet, est une loi per-
sonnelle, si son objet est personnel ; elle est réelle, si son objet est réel. Ré-
ciproquement, si une loi laisse une personne dans son état,et lui permet quelque
acte particulier que son état lui défend, il faut encore considérer la nature de
son objet ; s'il est personnel, la loi l'est également. Si l'objet est réel, la loi
doit aussi l'être. Rép. de Jur. *Verbo* Majorité, § 5.

It is true that the law of Maryland confers on the person of the wife
a certain capacity, and thus disposes of her acts. Yet this regulation
of a personal capacity, as a necessary means for the disposition of property,
which is the object of the statute, Boullenois says, is universally held not to
impair its real nature. He instances a statute, which permits husband and wife
to make to each other a mutual donation of the usufruct of their moveables
and acquêts ; and he says: " Il est certain que dans ce statut la loi dispose du
fait et du ministere des conjoints, puisqu'elle leur permet de donner les meubles
et acquê s en usufruit, et leur défend de se les donner en propriété, ni de se
donner en aucune maniere leurs propres ; cependant ces statuts passent par-
tout pour des statuts réels." Boullenois, vol. 1, p. 217, obs. vxi, ch. 1, tit. 2.

This is shown still more clearly by Merlin, in considering an analogous ques-
tion: " Les dispositions des lois et des coutumes, qui permettent ou prohibent
les avantages entre époux, forment-elles des statuts personnels, ou des statuts
réels ? Ce qui pourrait faire pencher pour la personnalité de ces statuts, c'est
qu'ils s'adressent aux personnes. Mais ce qui fait qu'un statut est personnel,
ce n'est pas qu'il s'adresse aux personnes ; autrement, tous les statuts seraient
personnels, car ce n'est jamais aux choses, *c'est toujours* aux personnes que
la loi parle. Le caractère distinctif du statut personnel, c'est qu'il règle *l'état*
de la personne, indépendamment des biens. Mais tel n'est pas le statut prohi-
bitif d'avantages entre époux: il suppose l'état des époux, il ne le fait pas ; il
ne prononce pas contre les époux une incapacité générale et absolue, il dit seule-
ment: dans mon territoire, pour les biens que je gouverne, point des disposi-
tions valables, si elles sont suspectes de suggestion, de captation ; et je présume
suggérées, captées, toutes les libéralités d'un époux à son épouse. Il est im-
possible qu'un semblable statut ne soit pas réel ; aussi le parti de la réalité
compte-t-il un nombre immense de sectateurs. * * * Pour discerner si un statut
est réel ou personnel, il ne faut pas précisément s'arrêter aux motifs qui ont pu
déterminer le legislateur, ni à la qualité des personnes aux quelles ce statut
permet ou défend quelque chose; il ne faut considérer que l'objet sur le quel
il porte, et c'est d'après la qualité de cet objet qu'on doit juger de la qualité du
statut." Quest. de Droit, *verbo* Avant. entre Époux, s. 2.

If the property mortgaged by *Mrs. Morton* had been dotal instead of para-
phernal, she would have had, by the law of Maryland, the same right to mort-
gage it for her husband's debts, that she has had to affect her rights in the suc-
cession of her mother in the present instance. Yet, can it be contended that
in such a case the mortgage would have been valid, in the very teeth of the law,
which declares that " Immovables, settled as dowry, can be sold or mortgaged
during the marriage, neither by the husband nor by the wife, nor by both toge-
ther, except as is hereinafter expressed." C. C. art. 2337. Boullenois has
discussed this very question at large, and he arrives at the following conclusion:
" J'estime donc que la prohibition faite à la femme de consentir à l'aliénation
de ses biens dotaux, est une prohibition particuliere et réelle, et que la femme
qui, par la loi de son domicile, ne peut les vendre, pourra vendre ceux qui sont

situés ailleurs, où pareille prohibition n'a pas lieu, et *vice versâ.* Ce que nous   <span style="float:right">Augusta Insu-</span>
pensons par rapport à l'aliénation des biens dotaux, Chorrier en sa Jurispru-   <span style="float:right">RANCE AND</span>
dence sur Gui-Pape, liv. 5, sect. 1, art. 3, le pense de même; et il dit qu'en Dau-   <span style="float:right">BANKING COM-</span>
phiné, la femme ne peut, ni aliéner, ni hypothéquer ses fonds dotaux, en quel-   <span style="float:right">PANY</span>
que lieu qu'elle habite, ou qu'elle contracte. fût-ce dans le Lyonnois, où les   <span style="float:right">*v.*</span>
femmes ont, par la Déclaration de 1664, la liberté de vendre leurs biens dotaux,   <span style="float:right">MORTON.</span>
et que cela fut ainsi jugé par Arrêt du 16 Mars 1688, par la seule considération
que les fonds étoient situés en Dauphiné." Traité des Statuts Réels et Per-
sonnels, vol. 1, p. 220, obs. xvi, chap. 1, t. 2.

The Senatusconsultum Velleianum, which forbade all women from be-
coming sureties, though considered by Le Brun, D'Argentré and others, a real
statute, is almost universally regarded as personal; and is very fully shown to
be such by Merlin, in his Répertoire, Verb. Sen. Vellei. §1. Yet Merlin says
in the same article, §11, that, if a woman, who is domiciled where the Senatus-
consultum does not exist, and where consequently she can become surety, forms
such a contract at her domicil, still her creditors cannot enforce their rights
upon her immovable dotal property, situated in a place where such property is
declared inalienable. And he cites several arrêts, which had been rendered in
conformity with this opinion. Among others he refers to one furnished by
Froland : " Il en rapporte d'abord un du 6 Septembre, 1664, par lequel il a
été jugé, que Catherine Maignard, épouse du- sieur de Flavacourt, dont le
contrat de mariage avait été passé à Rouen, lieu de sa naissance, et qui, imme-
diatement après la cérémonie nuptiale, avait suivi son mari dans le domicile
qu'il avait à Senlis, avait pu s'obliger envers des tiers par différens contrats qu'elle
avait faits avec son mari ; mais que ces obligations n'étaient pas exécutoires sur
ses propres normands. On fit la différence des deux prohibitions de la
coutume, l'une personnelle, et l'autre réele.   *      *      *      Mais
quant à la réelle, qui s'attache au fonds, l'on jugea qu'il fallait absolument la
laisser agir ; qui cette coutume devait régir les immeubles qui étaient situés
dans son ressort ; et qu'ainsi, faisant défense à la femme d'hypothéquer ses
biens par les contrats où elle parlait avec son mari, l'obligation de la marquise
de Flavacourt ne pouvait jamais valoir pour ceux qu'elle avait dans cette
province.   *      *      *      Froland ajoute qu'il en a été jugé
de même au parlement de Paris par cinq autres arrêts." And in like manner
Burge lays it down as a general principle that, " a contract, however legal it may
be in itself, cannot be enforced against property situated in a country, the
laws of which prohibit such a contract." Conflict of Laws, vol. 1, p. 29, part
1, ch. 1.

We think, then, that it abundantly appears from these principles and author-
ities, that the law of Maryland is a real statute, and, therefore, that its effect
in enabling *Mrs. Morton* to mortgage her separate estate for her husband's debts
must be confined within the territory of that State. For when a statute is
once shown to be real, it is then universally allowed that it can have no force,
and can support no acts done under its authority, beyond its own jurisdiction.
" Les lois réelles n'ont point d'extension directe, ni indirecte hors la jurisdiction
et la domination du législateur." Boullenois, Sat. Réels et Personnels, vol.
1, p. 7, prin. 27.

But, even admitting that the statute of Maryland is personal and not real,
what shall be said of our law, which ordains that : " Persons who reside out of
the State cannot dispose of the property they possess here, in a manner different
from that prescribed by our laws." C. C. art. 483. It falls precisely under
the definition of Merlin. " If the principal direct and immediate effect of the
law be to regulate the nature of property, and the manner of disposing of it,
the statute is real. It speaks only of persons incidentally, and its effects upon
their capacity and condition are remote and consequential. It does not even
refer to their capacity or condition ; it speaks of all persons generally, wheth-
er minors or not, whether married or unmarried. And, perhaps, the very ob-
ject of the law, in thus speaking, *ex industriâ*, of persons residing out of the
State, was to guard against any infringement upon its sovereignty, by those
who, domiciled in other jurisdictions, sanctioning dispositions of property con-
trary to its own policy, might seek to enforce such dispostions, by invoking the
principle of comity. It is certainly a real statute, and admitting the law of Mary-
land to be personal, the latter must yield in a conflict between the two. " Le
statut personnel du domicile qui se trouve en concurrence avec un statut réel,
soit du domicile, soit de tout autre endroit, cede au statut réel." Boullenois,

Augusta Insu-
rance and
Banking Com-
pany
*v.*
Morton.

Traité des Statuts Réels et Personnels, vol. 1, p. 8, prin. 30. A personal law which gives a permission, yields to a real law which prohibits. Burge's Con. of Laws, vol. 1, p. 26, no. 11. Merlin, Répertoire, verb. Majorité, §5. If then, the doctrine of personal and real statutes is to have any weight in this controversy, we think it clearly inclines the balance in our favor. To the universal validity of contracts it is, however, a necessary exception, that no people are bound to enforce, or hold valid in their courts of justice, any contract, which contravenes their policy, or violates a public law. Story, Con. of Laws, § 244. 8 M. 95. 6 La. 295. 13 La. 202. The exception is not limited to cases where the foreign law clashes with the rights of our own citizens, and where of course our own law will be preferred. But, even when the contract has been made between foreign citizens, and is valid by their law, it will not be enforced, if it offend our morals or contravene our general policy. Thus, Lord Mansfield says, in many countries a contract may be maintained by a courtezan for the price of her prostitution, and one may suppose an action to be brought here; but that could never be allowed in this country. *Robinson* v. *Bland,* 2 Burrows, 1084. In the present case, the plaintiffs seek to enforce a contract that contravenes our general policy and violates a public law. For it is one of our general rules, made for the protection of a great class of interests in society, that the wife's property shall not be involved in the embarrassment of the husband. It is our policy to preserve her property in the family, to protect the interests of the marriage state, against the interests of the husband's creditors, and to guard the wife against the martial influence, *ne amore spoliaretur.* And though the family of the defendants do not live in this State, the rule being once established, from general motives should be enforced, even in a particular instance when such motives may be wanting. "Individuals cannot by their conventions derogate from the force of laws, made for the preservation of public order or good morals." C. C. art. 11.

The rule, that the validity of a contract is to be determined by the law of the place where it was made, suffers yet another very important exception, which we think decisive of this controversy. It is a well settled rule that, where a contract is either expressly or tacitly to be performed in another place than that where it is made, its validity is to be governed by the law of the place of performance. The law of the place of the performance of the contract is the law of the contract, and, of course, governs as to its obligation and legal effect. Every one is understood to have contracted in the place where he has bound himself to perform the contract. *Contraxisse unusquisque in eo loco intelligitur, in quo ut solveret se obligavit.* D. L. 21, t. 2, l. 6. Such is the doctrine established by very numerous authorities in the common, the civil, and our own law. *Beirne* and *Burnside* v. *Patton.* 17 La. 592. *Cox* v. *United States,* 6 Peters, 203. *Fanning* v. *Consequa,* 17 Johnson, 518. Dig. l. 41, t. 7, l. 21. When a loan is made in one State, and security given in another by way of mortgage, the question has arisen on the statutes of usury, by what law the contract is to be governed. And it was said by the Supreme Court of the United States in the case of *De Wolf* v. *Johnson,* 10 Wheaton, 367, that the law of the place where the loan is made, is to govern; "for the mere taking of foreign security does not necessarily alter the locality of the contract. Taking such security does not necessarily draw after it the consequence, that the contract is to be fulfilled where the security is taken. The legal fulfillment of a contract of loan on the part of the bondsman is repayment of the money, and the security given is but the means of securing what he has contracted for, which in the eye of the law is, to pay where he borrows, unless another place be designated in the contract." This is very true in regard to the principal obligation of the loan; but it does not touch the validity of the accessary obligation of the mortgage. The one may be valid, and the other not. In the present case, the principal contract, which creates the liability of *Mr. Morton* on his promissory notes, may be valid; but the validity of the mortgage, given by his wife to ensure the payment of these notes is another, and quite a different question. It is true, *Mrs. Morton* signed the notes jointly with her husband, and they are payable, in contemplation of law, at the domicil of the makers, which is in Maryland. But the plaintiffs' own evidence shows, that *Mrs. Morton* is not liable on the notes. For she cannot by the law of Maryland bind herself for her husband. She has not, therefore, as far as she is affected by these notes, contracted to pay any thing, or perform any obligation in Maryland. That is not the place of her performance, and so not the place of her contract.

Her obligation is, to ensure the obligation of her husband; her husband's obli-
gation is to pay in Maryland; therefore, her obligation is to ensure the pay-
ment of an obligation in Maryland. But that is not an obligation to pay there
herself, if her husband do not; for if it were, she would then be a personal
surety, which she is not. Her obligation is only this, that, if payment be not
made in Maryland, she will surrender her property. Where will she surren-
der it? In Louisiana. In Louisiana then is her contract to take effect: that
is the place of her performance, and so the place of her contract, and so the place
whose law must determine the validity of that contract. If any doubt remain
on this point, it is removed by the 10th art. of the Civil Code, which declares :
"That the form and effect of public and private written instruments are gov-
erned by the laws and usages of the places where they are passed or executed.
But the effect of acts passed in one country to have effect in another country, is
regulated by the laws of the country where they are to have effect."

*Lockett* and *Goold*, on the same side. Two principal questions arise in this
case : 1st. Is the contract shown to be valid by the law of Maryland? 2d. Can
it be enforced in this State?

I. By the laws of Louisiana this contract, if made here, would be a nullity;
and it must be held to be null, unless it be affirmatively shown to be valid by the
law of Maryland. The onus is on the plaintiffs. The evidence does not show
this contract to be valid by the law of Maryland. The evidence clearly esta-
blishes that two things must have concurred to fix the liability of *Mrs. Morton :*
*first,* she must have given her assent; *second,* she must have been twenty-one
years of age. The first of these requisites is supplied, but the second is wanting.
*Mrs. Morton* is not bound by the contract, unless, when she made it, she had
passed her twenty-first year. But that she had, the record furnishes no evi-
dence. It may be urged that a plea of minority must be supported by proof.
But we do not plead minority. There is no evidence showing at what age per-
sons arrive at majority in Maryland, and none is necessary. The witnesses do
not say that such contracts are binding upon the property of married women
who have attained their majority. They must be *twenty-one years of age.*
Now we show that the contract offered against us is *primâ facie* void. If there
were no evidence showing what the Maryland law is, it would be presumed to
be like our own; and the contract would be avoided. The duty of the plaintiffs
then is, to show every fact, the existence of which is necessary to produce lia-
bility on the part of defendant; and the age requisite to contract was as much a
part of the plaintiffs' case as the execution of the agreement.

II. The mortgage and notes are one contract ; and, being an agreement rela-
tive to the disposition of real property, it must be tested by the law of the place
where it is situated. *Mrs. Morton* could not dispose of her real property situ-
ated in this State by a contract forbidden by the laws of this State. C. C. arts.
10, 483. *Andrews* v. *Pond*, 13 Peters, 65. Story's Conflict of Laws, p. 300
*et seq.* 18 Pick. 245. 10 Wheaton, 202. *Cutter* v. *Davenport*, 1 Pick. 86.
7 Cranch, 115. The question before the court is one of capacity to contract.
*Mrs. Morton* was without the capacity to bind herself under art. 2412 of the
Civil Code, which should prevail over the law of Maryland. For this article
relates to the capacity of a certain class of persons; and is, therefore, a prohi-
bitory or public law : and no contract made in violation of a prohibitory or public
law of the State, can be enforced here. "In every well regulated State, those
laws which establish the order of hereditary succession, which regulate the
capacity to dispose by last will, and particularly those which define the capacities
and incapacities of particular classes of person, &c., would seem to stand first in
rank of those rules, involving the great interests of society and public order, and
essential to their welfare." *Gasquet* v. *Dimitry*, 9 La. 590. *Zachariæ*, vol 1. p.
64. It is the public policy of Louisiana that no contract by which a married
woman has insured the payment of her husband's debts should be tolerated ; and
its validity, when made, would be vainly urged against our public policy. Story's
Conflict of Laws, § 244. *Saul* v. *His Creditors*, 5 Mar. N. S. 586, 596. C. C.
arts. 10, 11, 2305, 2307.

*A. Hennen*, also appeared for the appellants. The judgment of the court
was pronounced by

EUSTIS, C. J. This suit was instituted on two promissory notes, executed
by the defendant and his wife jointly, and secured by mortgage on immovable
property situated in Louisiana. The defendants were domiciliated in Mary-

land, where they continued to reside. The suit against them was commenced by attachment, under which the mortgaged property was attached. There was judgment against the defendants with privilege of mortgage on the property attached, and they have appealed.

The appellants have contended before us in argument: 1st. That no property of the husband having been attached, no judgment could be lawfully rendered against him. 2d. That *Mrs. Morton*, having bound her property and not herself personally, judgment could not be rendered against her, but only against her property. 3d. That a married woman cannot bind her immovable property in this State as surety for her husband's debts; and that the mortgage being invalid, no judgment should have been rendered against her property.

The first proposition is certainly tenable. No property of the husband having been attached, no judgment can be rendered against him. His appearance in court by a curator must be only considered as assisting his wife in the proceedings.

It is established that a married woman in Maryland, where these contracts were made, may become responsible for the debts of her husband, so as to bind property settled on her for her separate use, but not so as to bind herself personally; and hence it is inferred that no judgment could be rendered against her personally.

The question as to the validity of the mortgage granted by *Mrs. Morton* to secure the debt of her husband controls the case, and reduces the point raised as to the personal effect of the judgment to a mere matter of form.

The district judge thought that the ground on which the mortgage was attempted to be invalidated was a matter of personal disability, and depended exclusively on the law of the domicil of the party granting it. T. e argument before us has been principally directed to this question, whether the validity of the mortgage is to be tested by the laws of this State, or those of Maryland.

The article of the Code which provides that the wife cannot bind herself for the debts of her husband, according to the doctrine of the civilians, is a *personal* statute. It is founded exclusively on the personal relation between husband and wife, resulting from marriage under our laws, and of course is confined in its operation to married persons within our jurisdiction. True, it establishes an incapacity to contract, but this incapacity is merely relative, and it is settled by our jurisprudence that a wife cannot be relieved from the effect of a contract by which she became the surety for her husband, if the debt itself inured to her benefit. The disability to contract exists only in a certain contingency, and that contingency is strictly personal. The incapacity of a married woman to contract is of the same character as that of a minor, and the laws creating those incapacities have always been classed among those which are called *personal*. This article does not even purport to affect the immovable property of married women. Its operation upon such property is only indirect, as all property is affected by laws relating to contracts. It renders voidable contracts made by married women in certain cases, by reason of the consideration which it holds to be in conflict with the relations of husband and wife. It has no one characteristic of what is considered in jurisprudence as a *real* statute. Those laws are *real*, in contradistinction to *personal* statutes, which regulate directly property, without reference to the condition or the capacity of its possessor. The distinction between these classes of laws, though their application is in many cases difficult, appears to us to be obvious. 1 Duranton, § 79, 80.

The contract entered into in the present instance bound the property of the wife under the law of Maryland, where the contract was made, and where the husband and wife are domiciliated. The act of mortgage is valid in point of form. The property mortgaged was not dotal, and she would have had a right to sell or mortgage it, with the consent of her husband. in all but certain excepted cases, if her domicil had been in Louisiana. If there be no objection to the validity of this mortgage except that resulting from her incapacity as a married woman, we find no just ground for declaring it to be invalid. It conflicts with no law of the State, and there is no reason of comity which would authorize a court in Louisiana to relieve the wife from its effect. It interferes with no real statute ; and the personal statute does not reach it, by reason of the person not being subject to our jurisdiction and unaffected by our laws.

Suppose that by the laws of Maryland the age of twenty years was fixed as that of majority, and a person domiciliated in that State, above that age and not twenty-one years old, should sell real estate in Louisiana, he could not be aided by our courts in setting aside the sale afterwards on the ground of his minority. The answer to such a pretension would be, as in this case. The disability resulting from the condition of persons is personal, and contracts valid at the place of domicil, are valid without reference to the situation of the property, so far as the capacity of the party to contract is concerned. Merlin Rep. verbis Statut, Majorité, Autorization maritale. Sirey, Rep. 19, 2, 140, case of *Morris*. Traité des Personnes, par Proudhon, ch. 5, § 1. *Merchants' Bank of Baltimore* v. *Bank of United States*, 2 Annual Rep. 659.

We have examined with care the authorities cited in the learned argument, submitted by the counsel for the defendants. A review of them in detail would extend our observations beyond the length to be observed in judicial opinions. The counsel contends that the law of Maryland, by which a married woman, though generally incapacitated to make contracts, is enabled to bind her property for her husband's debts, is a real statute, and applies to property exclusively within the jurisdiction of that State. But we understand the right of the wife to bind her separate property for her husband to be founded on a rule of equity, which regards her as a *fême sole* in all cases in which she, without any fraud or unfair advantage, and with a clear intention of affecting her separate property, enters into an agreement respecting it : and this view, which a court of equity enforces in relation to her separate property, is independent of its character and *situs*, and removes every disability in respect to it, so far as a court of equity is called to act upon it.

It is not pretended that our conclusions on this question harmonize with all that has been written or decided on this difficult subject; but our aim has been to adopt none which from their generality would conflict with any recognized principle of jurisprudence, and we think we can safely rest the decision of the case on the authority of Merlin and Pothier. Merlin, *verbo* Senatus-consult. Vell. Pothier, Ob. 389.

It is, therefore, ordered that, the judgment of the District Court be reversed, and that the plaintiffs recover judgment against the defendant *Mary Ann Morton*, wife of *George C. Morton*, to be paid exclusively out of the property mortgaged, for the sum of $24,824 82, with interest at six per cent per annum on $12,234 22 from 6th March, 1843, and on the balance, $12,590 59, from 6th September, 1843, and that the property and rights attached in this suit, and described in the act of mortgage on file therein, be sold by the sheriff in satisfaction

Augusta Insu- of this judgment, with costs of the court below; the plaintiffs to pay the costs
rance and
Banking Com- of this appeal.*
pany
  v.
Morton.

---

*W. D. Hennen, for a rehearing.   The authority of Merlin and Pothier are cited by
the court, as supporting the judgment.   Merlin, *verbo* Sen. cons. Velleianum.   Pothier,
Obl. 389.   The appellants, on the contrary, urge that the authorities cited are
conclusive in their favor.   Pothier, *loc. cit.* says that, if a woman living in Paris,
by whose customs she can become surety, contracts an obligation of that kind, her
property, although situated in Normandy, by whose customs she cannot become surety,
will be bound.   He then supposes that it may be urged as an objection that the *Sen. con.*
*Velleianum* is indeed a personal statute, so far as it forbids a woman to bind herself per-
sonally for another ; but, that it is a real statute so far as it forbids a woman to bind her
property for another ; and that this latter part of the law, being real in its nature, should
govern all things within its jurisdiction, and therefore invalidate an obligation by which a
woman, though not personally subject to its operation, has bound her property in Norman-
dy for another's debt.   What does he say to this objection?   "Ma réponse est que cet
argument prouve seulement que si une parisienne, *sans se rendre caution et sans s'obliger*
*personnellement*, obligeait ses biens situés en Normandie, pour la dette d' autrui, *cette ob-
ligation seroit nulle;* parce que le velléien, observé en Normandie, qui a empire sur les
choses qui y sont situées, en empêche l'obligation pour la dette d'autrui."   But what Po-
thier here declares, to be proved by the objection he himself raises and to be a correct
principle, is the very case before the court ; for *Mrs. Morton " sans se rendre caution et*
*sans s'obliger personnellement*," has bound only her property situated in this State,
where the same law prevails as did once in Normandy ; and therefore "*cette obligation*
*serait nulle*," if we rest upon the authority of Pothier.

Merlin, in his Questions Mixtes sur le *Sénatus-consulte Villéirn*, No. 2, after showing
that the *senatus-consultum* is a personal and not a real statute, examines a decision of the
Parliament of Grenoble, in the case of *Guérimand* v. *Mazué*.   In that case *Mrs. Guéri-*
*mand*, living in Dauphiné, had removed with her husband to Paris, and become
his surety there.   After giving the reasons for which the suretyship was annulled,
Merlin says : "Mais supposons la dame *Guérimand* véritablement domiciliée à Paris dans le
temps où elle y avait contracté, et venant ensuite invoquer en Dauphiné l'exception du
Sénatus-consulte Velléien, non pour conserver un dot purement mobilière, mais pour sou-
straire aux poursuites des créanciers envers lesquels elle se serait obligée, des immeubles
dotaux régis par la loi Julia et frappés d'inaliénabilité.   Dans cette hypothèse, quel eût
été son sort?   Elle aurait dû triompher, nonobstant la personnalité du statut que forme
le Sénatus-consulte Velléien.     *     *     *     *     *     *    Ce que nous disons
de la loi Julia il faut le dire également des coutumes qui, à son exemple, frappent d'in-
aliénabilité les fonds dotaux.   Ainsi, quoique la femme normande soit, par le Sénatus-
consulte Velléien et à raison de la personnalité de ce statut, incapable d'obliger pour autrui
les biens qu' elle possède dans les coutumes où ce Sénatus-consulte n'est pas reçu, la
femme parisienne, *tout affranchie qu'elle est du Sénatus-consulte Velléien, ne peut ce-
pendant obliger pour autrui les immeubles dotaux qu'elle possède en Normandie."*

According to Merlin then, *Mrs. Morton* " tout affranchie qu'elle est du Sénatus-consulte
Velléien," or from the art. 2412 of our Civil Code, still could not bind her immovable pro-
perty situated in a State whose laws forbid a married woman to bind her property for her
husband.                                                            *Rehearing refused,*